# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHAWN BROOKS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CBS RADIO, INC.,** | : | |
| **Defendant** | : | **NO. 07-0519** |

## MEMORANDUM AND ORDER

PRATTER, J.                                         DECEMBER 17, 2007

Plaintiff Shawn Brooks sued his former employer, Infinity Broadcasting Corporation, which is now known as CBS Radio, Inc. Mr. Brooks makes his claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, asserting that the employer discriminated against him on the basis of his race. Specifically, Mr. Brooks, who is African-American, alleges that the actions of his supervisor at Infinity created a hostile work environment and that Infinity's failure to remedy the situation, prompting his departure from the company, amounted to a constructive discharge.

The employer moves to dismiss the Complaint on the ground that Mr. Brooks's claims are precluded by the doctrine of issue preclusion because Mr. Brooks previously litigated the same factual and legal issues raised in the Complaint at a public hearing before the Pennsylvania Human Relations Commission ("PHRC") and in subsequent proceedings before the Pennsylvania state courts. Alternatively, the defense moves for summary judgment on the ground that Mr. Brooks's Title VII claim fails as a matter of law based on undisputed facts in the record. At the

oral argument addressing these Motions, both parties agreed and confirmed that the record is complete and that no additional discovery is needed. (See Tr. 10/19/07 at 12, 23.)

For the reasons discussed more fully below, the Court will grant summary judgment in favor of CBS Radio, Inc.

**FACTUAL BACKGROUND**[1]

Mr. Brooks began working for Infinity in September 2000 as an account executive for WYSP, Philadelphia Eagles Radio. (Complaint ¶¶ 10-11.) As an account executive, Mr. Brooks's primary responsibility was to market the Eagles "radio product," (id. at ¶ 12), that is, advertising relating to the Eagles broadcasts (R. 340a). Among the approximately 25 account executives, Mr. Brooks was the only African American. (Compl. at ¶¶ 13-14.) Mr. Brooks's immediate supervisor was Joseph Zurzolo, the Eagles Radio Sales Manager, who in turn was supervised by Peter Kleiner, the WYSP General Sales Manager. (Id. at ¶ 19-20; R. 240a, 552a, 648a.)

In April or May 2001, Mr. Zurzolo instructed Jeffrey Snodgrass, the Sports Sales Manager, to purchase copies of a book ("the Book") setting forth certain views on how to dress in order to succeed at work, including advice specifically directed at people of color and women. (Compl. at ¶¶ 21-22.) At a meeting on May 9, 2001, Mr. Zurzolo distributed the Book to all the

---

[1] For the purposes of a motion to dismiss, the facts alleged in the Complaint are deemed to be true. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a Court may consider the Complaint, exhibits attached to the Complaint, matters of public record, and records of which the Court may take judicial notice, including records relating to administrative proceedings. Tellabs, Inc. v. Makor Issues & Rts., 127 S. Ct. 2499, 2509 (2007); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). References to the Pennsylvania Commonwealth Court record, which is attached to the defense Motion as Ex. P, are cited as "R. __a."

account executives ostensibly in an effort to address the perceived unprofessional manner in which a white female account executive had been dressing at work.  (Id. at ¶¶ 23-26; R. 246a-27a, 313a, 559a, 572a.)  Referring to the Book, Mr. Zurzolo told the account executives at the meeting, "Per human resources, use it."  (Compl. at ¶ 27.)  Mr. Zurzolo had not, and did not, read the Book before distributing it. (R. 572a.)[2]  After reading the Book, Mr. Brooks found specific passages to be offensive, as did another employee, Heidi Kaye.  (Compl. at ¶¶ 29, 31; R. 247a-261a.)  Rather than complaining directly to Mr. Zurzolo or to Mr. Kleiner (whom Mr. Brooks apparently did not trust) on May 10, 2001, Mr. Brooks called Sandy Shields, the Human Resources Director, Business Manager and Office Manager at WYSP, to complain about the contents of the Book.  (Id. at ¶¶ 32-33, 47-48, 50, 55.)  Mr. Brooks also declined to speak to Mr. Kleiner's supervisor, Ken Stevens, about the Book.  (Id. at 49.)

Ms. Shields told Mr. Brooks she would "find out" about the Book and observed that Mr. Brooks had a right to be upset.  (Id. at ¶¶ 52-53.)  Ms. Shields obtained a copy of the Book from Mr. Zurzolo's office and contacted Mr. Stevens about Mr. Brooks's concerns.  (R. 505a.)  Because Mr. Brooks had been offended by the Book, Mr. Stevens instructed Ms. Shields to collect all copies of the Book.  (Id.)  According to Ms. Shields and Mr. Kleiner, they, along with Mr. Zurzolo, succeeded in collecting all of the copies of the Book (other than Mr. Brooks's copy) that had been distributed within the company.  (R. 510a, 574a, 673a.)  Although Ms. Shields did

---

[2] Mr. Snodgrass apparently recommended the Book to Mr. Zurzolo (R. 594a, 597a) and purchased the copies of the Book with Mr. Zurzolo's personal credit card (R. 561a).  Mr. Zurzolo testified that he viewed the purchase of the Book as a personal expense, and it is undisputed that he did not ask or receive reimbursement for the Book from the employer.  (Id.; R. 1267a-1273a.)  Mr. Snodgrass and Mr. Zurzolo did not discuss the Book before Mr. Zurzolo distributed it.  (R. 594a.)

not communicate with the corporate office regarding Mr. Brooks's concerns (Compl. at ¶ 63), she offered to arrange for Mr. Brooks to talk to someone from the Human Resources Department in the corporate office (R. 530a).  Ms. Shields also invited Mr. Brooks to talk to Mr. Zurzolo, Mr. Kleiner or Mr. Stevens, but, according to Ms. Shields, although Mr. Brooks repeatedly expressed his intention to do so, he never did.  (R. 512a, 530a, 497a.)   In addition, Mr. Kleiner and Mr. Zurzolo called Mr. Brooks several times requesting that Mr. Brooks call them, but Mr. Brooks did not return their calls because he did not "trust or respect them," and did not want to speak with them because "it was a hostile work environment."  (Compl. at 75-77; R. 279a-80a, 581a-82a, 676a.)

Mr. Kleiner verbally reprimanded Mr. Zurzolo for distributing the Book without reading it first.  (R. 576a, 675a.)  Since the time he was reprimanded, Mr. Zurzolo has not distributed any other book to the Eagles Radio sales staff.  (R. 578a.)  In addition, at the Eagles Radio sales meeting occurring the week after the distribution of the Book, Mr. Kleiner told the staff that the Book did not represent the views of Infinity, himself or Mr. Zurzolo, who had not read the Book before distributing it.  (R. 677a.)[3]

Following two additional telephone consultations between Mr. Brooks and Ms. Shields, Mr. Brooks determined that Ms. Shields was not going to resolve the matter.  (Compl. at ¶ 54; R. 496a, 512a.)  After the May 9, 2001 Book distribution, Mr. Brooks returned to the office only once, on May 28, 2001, to submit his letter of resignation and collect his personal items.  (Id. at ¶ 65.)  Mr. Brooks apparently believed he had resigned as of the time he filed his PHRC Complaint

---

[3] Mr. Brooks admits that at the time he resigned, he did not know that Mr. Kleiner had reprimanded Mr. Zurzolo for distributing the Book, or that Mr. Kleiner had addressed the Eagles sales staff regarding the unauthorized distribution of the Book.  (R. 402a.)

4

on May 16, 2001.  (R. 313a.)  Mr. Brooks did not discuss his intention to resign with anyone at the station before submitting his resignation letter.  (R. 309a, 312a.)

In his Complaint here, Mr. Brooks also alleges additional incidents of what he contends constituted harassment that occurred *prior to the distribution of the Book* (which the Court will refer to as the "additional allegations").  They are as follows:

1.  During the period of Mr. Brooks's employment, Mr. Zurzolo made a comment to Mr. Brooks about "having a go with [Mr. Brooks's] fiancée," which Mr. Brooks understood to mean that Mr. Zurzolo wanted to have sexual relations with Mr. Brooks's fiancée.  (Compl. ¶¶ 35-36.)

2.  Mr. Zurzolo on several occasions "palm[ed]," or put his hand on, the head of an older African-American receptionist, who, according to Mr. Brooks, did not approve of Mr. Zurzolo's action.  (Id. at ¶¶ 40-41.)  Mr. Brooks considered this action to be an intentionally racially offensive gesture.  (Id. at ¶ 42.)

3.  Mr. Zurzolo used the ethnic slur "dago" and other derogatory expressions in reference to himself and his own Jewish-Italian ancestry.  (Id. at ¶ 43; R. 40a.)

4.  On one occasion, Mr. Zurzolo inappropriately touched an African-American receptionist on a sales call at Comcast.  (Id. at ¶ 44.)

5.  On one occasion, in the presence of Mr. Brooks, someone stole a promotional banner relating to Mr. Brooks's ING Direct account, an act that Mr. Brooks believes was racially motivated because ING Direct was a coveted account.  (Id. at ¶ 45.)

Until the filing of this suit, Mr. Brooks did not tell anyone at WYSP about these incidents because he did not trust his supervisors and colleagues, and because he felt that "those views were tolerated and accepted in the office."  (Id. at ¶¶ 38-39, 46.)

5

**PROCEDURAL HISTORY**

On May 16, 2001, Mr. Brooks filed an administrative complaint with the PHRC, and simultaneously filed a similar complaint with the EEOC, alleging that Infinity discriminated against him because of his race in violation of the Pennsylvania Human Relations Act ("PHRA"). In the PHRC Complaint, Mr. Brooks alleged that the distribution of the Book created a hostile work environment and caused his constructive discharge.   Mr. Brooks did not specify any allegation of harassment other than the distribution of the Book.

On November 28, 2001, the PHRC found probable cause to believe that the distribution of the Book alone violated the PHRA.   After a period of discovery, during which time the parties exchanged documents and conducted depositions, the PHRC ordered a public hearing.   At the hearing, held on November 6-7, 2003, Mr. Brooks was represented by his own counsel, who examined witnesses and presented evidence with respect to the additional allegations of harassment, as well as the distribution of the Book.

On February 28, 2005, the PHRC issued Findings of Fact and Conclusions of Law, the Recommendation of the Hearing Panel, an opinion and a Final Order, ultimately finding in favor of Mr. Brooks on his hostile work environment and constructive discharge claims.   The Commission awarded him approximately $600,000 in economic damages in addition to ordering injunctive relief.

On April 5, 2005, Infinity petitioned the Pennsylvania Commonwealth Court to review the PHRC's decision.   After the Commonwealth Court granted Infinity's petition, Mr. Brooks joined in the PHRC's brief and participated in oral argument.   On February 9, 2006, the Commonwealth Court reversed the PHRC's decision.   The Commonwealth Court found that the

PHRC should not have considered the additional allegations of harassment beyond the distribution of the Book because they were not included the PHRC Complaint. Proceeding without consideration of the additional allegations, the Commonwealth Court held that under the case law interpreting the PHRA and Title VII, the distribution of the Book, alone, was not sufficiently severe or pervasive to constitute a hostile work environment or an event causing constructive discharge.

On April 24, 2006, the PHRC petitioned the Pennsylvania Supreme Court to review the Commonwealth Court's decision. Mr. Brooks intervened in the proceedings before the Pennsylvania Supreme Court, filing a separate Petition for Review. In September 2006 the Pennsylvania Supreme Court denied allocatur.

**LEGAL STANDARDS**

**A.      Motion to Dismiss**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. <u>Conley</u>, 355 U.S. at 45-46. Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," <u>Conley</u>, 355 U.S. at 47. While a complaint need not contain detailed factual allegations, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-1965 (2007) (citations omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." <u>Id.</u> at 1965 (citations omitted).

In making such a determination, the Court "must only consider those facts alleged in the

complaint and accept all of those allegations as true." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855,

859 (3d Cir. 1994) (citing Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984)); see also Bell

Atlantic, 127 S. Ct. at 1965 (stating that courts must assume that "all the allegations in the

complaint are true (even if doubtful in fact)").  The Court must also accept as true all reasonable

inferences that may be drawn from the allegations, and view those facts and inferences in the

light most favorable to the non-moving party.  Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir.

1989).[4]

**B.     Issue Preclusion (Collateral Estoppel)**

The doctrine of collateral estoppel, or issue preclusion,[5] forecloses "re-litigation in a later

action [] of an issue of fact or law which was actually litigated and which was necessary to the

original judgment."  Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 548 (3d Cir. 1996)

(citations omitted).  As our Court of Appeals explained, "[i]ssue preclusion embodies the

principle that later courts should honor the first actual decision of a matter that has been actually

---

[4] As previously discussed, to evaluate a motion to dismiss, the Court may consider
matters of public record and records of which the Court may take judicial notice, including
government agency records.  See Tellabs, Inc., 127 S. Ct. at 2509; Pension Benefit Guar. Corp.,
998 F.2d at 1196.  The Court may also consider "an undisputedly authentic document that a
defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the
document."  Pension Benefit Guar. Corp., 998 F.2d at 1196.  The documents constituting the
administrative record in this case are central to Mr. Brooks's assertion that he exhausted
administrative remedies with respect to all of his claims, and the Pennsylvania state court record
is essential to determining whether issue preclusion bars Mr. Brooks's claims.  Accordingly, the
Court will consider the administrative and state court records in determining whether Mr.
Brooks's claims have been exhausted and whether the doctrine of issue preclusion bars litigation
of those claims.

[5] Issue preclusion "is somewhat more limited than claim preclusion because [it involves]
relitigation only of an issue identical to that adjudicated in the prior action."  Rider v.
Commonwealth of Pennsylvania, 850 F.2d 982, 989 (3d Cir. 1988).

litigated." Rider, 850 F.2d at 989 (citation omitted).  Issue preclusion applies if the following four elements are satisfied: (1) the issue decided in the prior adjudication was identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted had a full and fair opportunity to litigate the issue in question in a prior action.  Dici, 91 F.3d at 548.  The party asserting preclusion bears the burden of proving its applicability.  Id.

C.    **Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the Court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case," id. at 325, or by offering affirmative evidence which demonstrates that the plaintiff cannot prove his case, Lawrence v.

9

<u>Nat'l Westminister Bank N.J.</u>, 98 F.3d 61, 69 (3d Cir. 1996).  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

The evidence provided by the nonmovant is to be believed, and the Court must draw all reasonable and justifiable inferences in the nonmovant's favor, <u>Anderson</u>, 477 U.S. at 255, and resolve all "doubts and issues of credibility against the moving party," <u>Smith v. Pittsburgh Gage & Supply Co.</u>, 464 F.2d 870, 874 (3d Cir. 1972).  At the summary judgment stage, the Court's function "is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  <u>Brooks v. Kyler</u>, 204 F.3d 102, 105 n.5 (3d Cir. 2000).

**DISCUSSION**

**A.      Issue Preclusion**

The question of whether issue preclusion bars Mr. Brooks's Title VII claims turns on the first factor: whether the issue decided in the prior adjudication was identical to the one presented in the later action.  Here, the determination of this question depends on whether the Court may consider the additional allegations that were included in the judicial Complaint here, but which were not included in the PHRC Complaint.

Under the doctrine of issue preclusion, an issue of fact or law that was determined previously by a court of competent jurisdiction may not be disputed in a subsequent suit between the same parties or their privies.  <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979).  Federal law requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the state from which the judgments emerged.  <u>Kremer</u>

10

v. Chemical Construction Corp., 456 U.S. 461, 479-80 (1982) (holding that under 28 U.S.C. §

1738, a federal court in a Title VII action should grant preclusive effect to a state court decision

upholding a state administrative agency determination when the state court's decision would be

barred by issue preclusion in subsequent actions in that state's own courts); see also Dici, 91 F.3d

at 548-49.[6]

 Likewise, a federal Title VII claim is precluded where a state court determines an issue

dispositive to that claim, even if the issue was determined in a different context.  See Rider, 850

F.2d at 989 (holding that prison guards' Title VII claim was precluded because both the Title VII

claim and the state law claims raised in state court proceedings turned on the same issue –

whether female gender was a bona fide occupational qualification for the positions sought by the

male guards); see also Witkowski v. Welch, 173 F.3d 192, 203 (3d Cir. 1999) (holding that under

Pennsylvania law, precise identity of the causes of action asserted is not required for issue

preclusion to apply; only the issues need be the same).

 Here, leaving aside for the moment the five additional allegations of discriminatory

conduct, the factual and legal issues are identical to those adjudicated in the state court

proceedings.  See Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-1084 (3d Cir.

1995) (citing Chmill v. City of Pittsburgh, 412 A.2d 860, 871 (Pa. 1980); Kryeski v. Schott Glass

Techs., Inc., 626 A.2d 595, 598 (Pa. Super . Ct. 1993)) (The Pennsylvania Human Relations Act

---

 [6] To the extent that legislative history has previously been reviewed in this context,
concluding that "neither the statutory language nor the congressional debates suffice to repeal §
1738's long-standing directive to federal courts,"  Kremer noted that "[n]othing in the legislative
history of [Title VII] suggests that Congress considered it necessary or desirable to provide an
absolute right to relitigate in federal court an issue resolved by a state court."  Kremer, 456 U.S.
at 476, 473.

"is construed consistently with interpretations of Title VII."); Lepore v. Lanvision Sys., Inc., 113 F. App'x 449, 452 (3d Cir. 2004) ("Claims arising under the PHRA are governed by the same legal standard as that applied to Title VII.").  Although Mr. Brooks raised the additional five allegations during the state court proceedings following the administrative decision of the PHRC, the Commonwealth Court did not consider those allegations because they were not included in the PHRC Complaint or raised during the state agency's investigation.[7]

_____

[7] The defense argues that although the Commonwealth Court determined that the additional allegations were procedurally barred, those allegations were nevertheless raised and adjudicated in state court.  Therefore, contends CBS Radio, the issue of administrative exhaustion is also barred by the operation of issue preclusion.  However, the federal legal standard concerning administrative exhaustion is substantially different than the legal standard for exhaustion under state law.  Compare Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976) with Murphy v. Pa. Human Relations Comm'n, 465 A.2d 740, 746 (Pa. Cmwlth. 1983).  Thus, as discussed below, issue preclusion does not bar the exhaustion issue.

The Commonwealth Court based its exhaustion determination on the fact that "the [administrative] complaint did not list the other allegations of harassment [besides the distribution of the book], and at no time did Brooks amend the complaint to reflect the same." (Def. Mot. Ex. B at 11 (citing 43 P.S. § 959).)  That court also determined that the administrative exhaustion requirement of the PHRA was intended to "inform the employer of the specific conduct complained of . . . ." and thus enable the employer to takes steps to avoid litigation.  Id. Indeed, the PHRA requires a complainant to file an administrative complaint setting forth "the particular[]" allegations against an employer in order to put the employer "on notice of the *specific* conduct which is alleged to be discriminatory." (Id. at 9 (citing 43 P.S. § 959(a) (emphasis added); Murphy, 465 A.2d at 746).)

In contrast, the federal legal standards governing whether Mr. Brooks exhausted the required procedures for raising his additional allegations are less formalistic than those the Commonwealth applied in holding the allegations were not properly before the PHRC.  While it is true that "[t]o defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be 'substantial,'" Raytech Corp. v. White, 54 F.3d 187, 191 (3d Cir. 1995), the difference presented here is precisely that.  The state court's formalistic review of whether an allegation of discriminatory conduct was *explicitly* specified in the administrative complaint differs substantially from the approach taken by federal courts interpreting Title VII's exhaustion requirement.  Specifically, "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Ostapowicz, 541 F.2d at 398-99.  Thus, the ensuing suit is limited by the reasonable scope of the original administrative charge, not by the specific allegations presented to the agency.  See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.

The issue of administrative exhaustion is not barred by issue preclusion because the state and federal standards for exhaustion are substantially different.  (See note 7, supra.) Consequently, the Court must determine whether, under federal law, Mr. Brooks exhausted the additional allegations that he now describes as harassment.  If the Court determines that Mr. Brooks failed to exhaust administrative remedies with respect to the five additional allegations (and essentially carves them out of the case for that reason), the factual and legal issues presented here are identical to those litigated in the state court proceedings and, therefore, are barred by the doctrine of issue preclusion.  However, if the Court determines that it may here consider the additional allegations, the factual and legal issues are distinct from those litigated in state court and there is no preclusion.[8]

## 1.      Exhaustion of Administrative Remedies

A plaintiff must exhaust all administrative remedies before bringing a claim for relief in federal court.  Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997) (citing McKart v. United States, 395 U.S. 185, 193 (1969)).  The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation and persuasion, and thereby avoid unnecessary action in court.  Antol, 82 F.3d at 1296.  Before filing a suit under Title VII, a plaintiff must exhaust his administrative remedies by filing a timely discrimination charge with the EEOC.  Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).  A charge should contain "[a]

---

1996).

[8] The last three elements of collateral estoppel are not in dispute here.  It is undisputed that the state court proceedings constitute a final adjudication on the merits; that Mr. Brooks was a party or in privity with a party to the state court proceedings; and that Mr. Brooks had a full and fair opportunity to litigate the issue in question in the prior action.

clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3). Notwithstanding these specifications, a charge "is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Id. at § 1601.12(b).

The Third Circuit Court of Appeals has explained that "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . ." Ostapowicz, 541 F.2d at 398-99. Thus, the ensuing suit is limited to claims that are within the scope of the original administrative charge. Antol, 82 F.3d at 1295. In other words, "a subsequent civil action may only encompass forms of discrimination similar or related to those filed in the EEOC charge." Kresefsky v. Panasonic Communs. & Sys. Co., 169 F.R.D. 54, 61 (D.N.J. 1996).

Federal courts have taken a "fact-specific" approach to this inquiry, requiring a careful examination of "the prior pending EEOC complaint and the unexhausted claim on a case-by-case basis before determining that a second complaint need not have been filed." Robinson, 107 F.3d at 1024. "The determination 'turns on whether there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may fairly be considered explanations of the original charge or growing out of it.'" Janis v. La-Z-Boy Furniture Galleries, No. 05-2410, 2006 WL 724157, at *5 (E.D. Pa. March 17, 2006) (citation omitted). The Court of Appeals has stated that "the scope of [an EEOC] charge should be liberally construed" because "charges are most often drafted by one who is not well versed in the art of legal description." Hartwell v. Lifetime Doors, Inc., No. 05-2115, 2006 WL 381685, at

14

*17 (E.D. Pa. Feb. 16, 2006) (citing Hicks v. ABT Assocs. Inc., 572 F.2d 960, 965 (3d Cir.

1978)).

To determine whether a plaintiff has exhausted administrative remedies, the Supreme

Court has emphasized the need to identify the specific employment practice that allegedly

constitutes an act of discrimination. Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S. Ct.

2162, 2167 (2007). The statutory term "employment practice" refers to "a discrete act or single

'occurrence'" that takes place at a particular point in time. Id. at 2169. "[I]f an employer

engages in a series of acts each of which is intentionally discriminatory, then a fresh violation

takes place when each act is committed." Id. at 2169. When an employee alleges "serial

violations," i.e., a series of actionable wrongs, a timely EEOC charge must be filed with respect

to each discrete alleged violation. Id. at 2175. As examples of such "discrete acts," the Supreme

Court has cited termination, failure to promote, denial of transfer, and refusal to hire. Id.

When an allegation relates to a hostile work environment claim, however, courts have

shown greater leniency with respect to the timing of administrative filings, admissibility of

evidence and exhaustion of administrative remedies. Indeed, as the Supreme Court observed,

"[h]ostile work environment claims are different in kind from discrete acts. Their very nature

involves repeated conduct." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115

(2002). Because "[s]uch claims are based on the cumulative effect of individual acts," the

"unlawful employment practice" at issue "cannot be said to occur on any particular day." Id.

Rather, "it occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a

single act of harassment may not be actionable on its own." Id.

In Morgan, the Supreme Court addressed the issue of "whether a court may, for the

purposes of determining liability, review all such conduct [related to a hostile work environment claim], including those acts that occur outside the [administrative] filing period." Id. Noting that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute an 'unlawful employment practice,'" the Supreme Court held that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 116-17. The Court explained that

> [i]t is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for purposes of timing and liability.

Id. at 117-118. Because "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim," and "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. at 118.

Similarly, in West v. Philadelphia Elec. Co., 45 F.3d 744 (3d Cir. 1995), a racial harassment case, the Court of Appeals for the Third Circuit held that "district courts should apply a 'totality of the circumstances' standard to ascertain whether specific instances of harassment are relevant to prove the existence of a hostile work environment." Id. at 756. Although the narrow issue in West was the admissibility of evidence at trial rather than exhaustion of

16

administrative remedies, the Court of Appeals' broad interpretation of the scope of a hostile work environment claim is relevant to issue presented here, that is, whether additional allegations of workplace harassment relevant to a hostile work environment claim must be separately exhausted.  Read together, West and Morgan reflect a broad interpretation of the scope of hostile work environment claims to look at the instances of harassment *in the aggregate* in order to ascertain whether the incidents *collectively* create a hostile work environment.

In King v. M.R. Brown, Inc., 911 F. Supp. 161 (E.D. Pa. 1995), the district court relied on West to determine that a plaintiff's "new" allegations of harassment, while not included in the administrative complaint, were properly before the court because the "new" additional allegations "merely buttress[ed] her original claim of hostile work environment, which she properly raised with the EEOC and of which [the defendant] was clearly on notice."  Id. at 166.  That court reasoned that "[b]ecause plaintiff may offer evidence of these "new" allegations at trial without stating a new cause of action [as per West], it would make little sense to require her to file a separate Charge of Discrimination with the EEOC based on these allegations."  Id.  More recently, in Ziner v. Cedar Crest College, No. 04-3491, 2006 WL 1517387 (E.D. Pa. May 30, 2006), the court, citing West, held that the plaintiff need not separately exhaust his administrative remedies for new allegations contained in his amended complaint because the new allegations "assert nothing more than an additional incident contributing to this overall pattern of harassment by the college.  He has not brought any new cause of action."  Id. at *3.

The circumstances presented here by Mr. Brooks are analogous to those in King and Ziner.  Mr. Brooks does not seek to add a new cause of action.  Rather, he has simply added additional allegations of harassment in support of his hostile work environment claim.  These

17

additional alleged incidents are not "discrete acts."  Standing alone, they are not actionable; they

"merely buttress" Mr. Brooks's hostile work environment claim, which was duly exhausted and

of which CBS Radio had ample notice.  Given the leniency with which the Supreme Court and

the Third Circuit Court of Appeals have addressed timing and admissibility issues related to

hostile work environment claims, courts have applied a similar broad view to the issue of

exhaustion.  See King 911 F. Supp. at 166; Ziner, 2006 WL 1517387, at *3.  The Court will do

the same here.

### 2. Identity of the Issue

To apply issue preclusion, the Court need not find that the claims in two separate actions

were identical, only that there are identical factual or legal issues.  Witkowski, 173 F.3d at 203;

CIR v. Sunnen, 333 U.S. 591, 599 (1948) (collateral estoppel applies where the controlling facts

and applicable legal rules remain unchanged from the first proceeding).  "Identity of the issue is

established by showing that the same general legal rules govern both cases and that the facts of

both cases are indistinguishable as measured by those rules."  Suppan v. Dadonna, 203 F.3d 228,

233 (3d Cir. 2000).  "To defeat a finding of identity of the issues for preclusion purposes, the

difference in applicable legal standards must be 'substantial.'"  Raytech Corp., 54 F.3d at 191

(citations omitted).

Here, as previously noted, the applicable legal rules are same as those applied by the

Commonwealth Court.  See Gomez, 71 F.3d at 1083-1084 (citing Chmill, 412 A.2d at 871;

Kryeski, 626 A.2d at 598) (The Pennsylvania Human Relations Act "is construed consistently

with interpretations of Title VII."); Lepore, 113 F. App'x at 452 ("Claims arising under the

PHRA are governed by the same legal standard as that applied to Title VII.").[9]

However, while the applicable legal rules remain unchanged, the controlling facts are substantially different in the two proceedings.  The issue specifically decided by the Commonwealth Court was whether the distribution of the Book *alone* is sufficiently severe or pervasive to create a hostile work environment.  Because, as discussed above, the additional allegations are within the scope of the PHRC Complaint and, therefore, properly exhausted, the issue presently before the Court is whether the distribution of the Book along with the five other alleged incidents of harassment *collectively* are sufficiently severe or pervasive to create a hostile work environment.  Thus, the first element of issue preclusion, which requires the issue decided in the prior adjudication to be identical to the one presented in the later action, Dici, 91 F.3d at 548, is not satisfied.  Therefore, issue preclusion does not bar this suit, and its dismissal on that ground is not warranted.

**B.      Summary Judgment**

      **1.      Hostile Work Environment**

Title VII makes it an unlawful employment practice for an employer "to discriminate

---

[9] Contrary to Mr. Brooks's assertions, the Commonwealth Court did not incorrectly apply the legal rules governing hostile work environment claims.  Rather, the Commonwealth Court applied to Mr. Brooks's PHRA hostile work environment claims the same legal standard as applied under Title VII.  See Def. Mot. Ex. B at 11-12 ("In order to prima facie establish a hostile work environment under the PHRA, a complainant must demonstrate that he: 1) suffered intentional discrimination because of his race or gender; 2) the harassment was severe or pervasive and regular; 3) the harassment detrimentally affected him; 4) the harassment would detrimentally affect a reasonable person of the same protected class; and 5) the harasser was a supervisory employee or agent.") (citing Barra v. Rose Tree Media Sch. Dist., 858 A.2d 206, 215 (Pa. Cmwlth. 2004)).  Moreover, the Commonwealth Court cited exclusively federal cases in determining whether the distribution of the book constituted a hostile work environment.  (See Def. Mot. Ex. B at 12-16.)

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The scope of protection provided by Title VII includes protection against a hostile work environment that is abusive to an employee on the basis of his or her race. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West, 45 F.3d at 753 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)).

In order to establish a hostile work environment claim under Title VII, a plaintiff must show that "(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." Cardenas, 269 F.3d at 260 (citing Aman, 85 F.3d at 1081). The harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." West, 45 F.3d at 753 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)) (internal quotations omitted); see also Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990) (characterizing the second prong of the test as whether the harassment was "pervasive or severe"). The Court must consider the "totality of the circumstances" to determine whether the alleged conduct constitutes a hostile work environment. Cardenas, 269 F.3d at 260-61; West, 45 F.3d at 753.

Our Court of Appeals has cautioned that in considering whether a plaintiff has established the elements of a hostile work environment, "the record must be evaluated as a whole to decide whether the plaintiff has proved his or her case, because '[p]articularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with

pitfalls and ambiguities . . . . [A] discrimination analysis must concentrate not on individual

incidents, but on the overall scenario.'" Cardenas, 269 F.3d at 260-61.  Moreover, Title VII

applies to both "facially neutral mistreatment" and "overt ethnic discrimination," which in sum

constitute the hostile work environment.  Id. at 261 (citing Aman, 85 F.3d at 1081-84 (discussing

the obligation of the courts to be "increasingly vigilant" against subtle forms of discrimination,

and the importance of allowing plaintiffs to prove discrimination indirectly).  As the Court of

Appeals has emphasized, "the advent of more sophisticated and subtle forms of discrimination

requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom,

including those concerning incidents of facially neutral mistreatment, in evaluating a hostile

work environment claim."  Id. at 261-62.

Here, Mr. Brooks alleges the five separate incidents of what he claims constituted

harassment, plus the distribution of the Book, all of which have been described above.  These six

incidents occurred over the course of approximately nine months, from September 2000 to May

2001.

For the purposes of this Motion, CBS Radio does not dispute that these incidents

occurred.  (See Tr. 10/16/07 at 23.)  Thus, the questions before the Court are questions of law:

(1) whether these six incidents constitute intentional discrimination based on Mr. Brooks's race;

(2) whether any such discrimination was pervasive or severe; and (3) whether any such

discrimination would have detrimentally affected a reasonable person of the same protected class

in Mr. Brooks's position.[10]  The Court must also determine whether the alleged discrimination

---

[10] Mr. Brooks, who is African-American, is a member of a protected class, and for the
purposes of this Motion, the Court will assume that the alleged incidents detrimentally affected
him, and that there is a basis for vicarious liability.

amounted to a constructive discharge, and whether any affirmative defense applies.

a.    **Intentional Discrimination on the Basis of Race**

Facially neutral conduct in addition to overt racial discrimination can support a hostile work environment claim.  Cardenas, 269 F.3d at 260-61.  However, there must be at least some overt racially hostile words or conduct to signal the invidious nature of the facially neutral conduct.  For example, in Cardenas, the court of appeals held that in light of the plaintiff's supervisor's facially discriminatory comments about the plaintiff's ethnicity, the facially neutral management decisions complained of by the plaintiff constitute evidence "from which a jury might find ethnic animus underlying other ostensibly nondiscriminatory incidents."  Cardenas, 269 F.3d at 262.  Likewise, in Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005), the Court of Appeals held that a reasonable jury believing the plaintiff's account of the surrounding circumstances – that his supervisors "exhibited racist tendencies" and that there was no real basis to think the plaintiff had psychiatric problems – could have concluded that the supervisors "wrote intentionally false memos and recommended [the plaintiff] for psychiatric treatment in order to harass him based on race."  Id. at 264.  This determination "call[ed] into question whether the District Court was correct in finding that [the plaintiff] failed as a matter of law to meet the requirements of a Title IIV . . . hostile work environment claim."  Id.[11]  However, even under those circumstances, the court of appeals noted that the plaintiff's hostile work environment claim was "a close issue."  Id. at 262.

In Caver, "no racist comment, written or spoken, was ever directed at [the plaintiff]

---

[11] The court of appeals did not reach this issue because the jury verdict on the plaintiff's other claims "conclusively determined the factual issues underlying [the plaintiff's] hostile work environment claim in favor of the City."  Caver, 420 F.3d at 264.

himself." <u>Id.</u> at 263.  In that regard, the court held that a plaintiff cannot meet the first element of the hostile work environment claim under Title VII – causation – "*solely* by pointing to comments that were directed at other individuals" because the plaintiff "cannot show that the comments would not have been uttered or written but for *his* race if [the plaintiff] was neither on the receiving end nor the subject of any comments." <u>Id.</u> at 263.  Specifically, the court noted that "although there was some evidence . . . of inappropriate racist comments, graffiti, and flyers, this evidence was insufficient without more to establish a hostile work environment." <u>Id.</u>  However, while such racist comments "cannot alone be the basis of the hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct on the part of [the plaintiff's supervisors] was actually based on [the plaintiff's] race." <u>Id.</u> at 264.

Here, the undisputed evidence in the record fails to demonstrate, or raise a genuine issue of fact as to whether, the alleged conduct was intentionally based on race because there were no overtly or explicitly racially hostile comments or conduct directed at either Mr. Brooks or others. In other words, there are no "surrounding circumstances" that would expose the purportedly discriminatory nature of what is otherwise racially neutral conduct.

First, Mr. Zurzolo's comment about Mr. Brooks's fiancée, while certainly potentially offensive, is facially unrelated to Mr. Brooks's race.  Indeed, Mr. Brooks surmises that the comment was made because Mr. Zurzolo was his boss.  (Def. Ex. A ¶ 24.)  That employment relationship has nothing to do with anyone's race.

Second, despite Mr. Brooks's speculation, Mr. Zurzolo's "palming" of the head of Edith

Mason, an African-American secretary, is also facially unrelated to race.[12]  See Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999) (plaintiff's mere speculation insufficient to prove discrimination).  Indeed, Ms. Mason herself testified that Mr. Zurzolo's conduct was a "friendly gesture" that she did not find racially offensive.  (R. 640a-41a.)[13]

Third, Mr. Zurzolo's use of the ethnic slur "dago" in reference to himself was not based on Mr. Brooks's race, nor was it directed at Mr. Brooks.  In Caver, the court determined that the plaintiff could not meet the first element of the hostile work environment claim under Title VII – causation – "*solely* by pointing to comments that were directed at other individuals," even though the comments in question disparaged the plaintiff's own race.  Here, where the comments did not disparage Mr. Brooks's own race, the rule applies with even greater force.  Mr. Zurzolo's comments were not directed at Mr. Brooks and did not disparage African Americans.  Like the plaintiff in Caver, Mr. Brooks "cannot show that the comments would not have been uttered or written but for *his* race if [Mr. Brooks] was neither on the receiving end nor the subject of any comments."  Caver, 420 F.3d at 263.

---

[12] Mr. Brooks requested by letter dated November 20, 2007 to supplement the record after oral argument on the Motion with an expert report concerning the "racially insensitive" nature of the "palming" gesture.  Mr. Brooks's request is denied because, as both parties agree, discovery in this case is closed and the record is complete.  (See Tr. 10/16/07 at 12, 23.)  Mr. Brooks had a full opportunity to present any expert testimony or other evidence regarding the palming allegation in his Opposition to Defendant's Motion for Summary Judgment, as well as during the prior proceedings before the PHRC.  Indeed, because there was nothing in the record to indicate what "palming" was, the Court inquired of counsel during oral argument to describe the gesture.

[13] Ms. Mason also testified that she and Mr. Zurzolo were friends; that Mr. Zurzolo actively sought employment for Ms. Mason at WYSP; that when they previously worked together at a different radio station, Mr. Zurzolo had given Ms. Mason rides to and from work when there was bad weather even though they did not live near each other; and that Mr. Zurzolo had invited Ms. Mason to spend weekends with his family.  (R. 637a, 640a, 644a.)

Fourth, Mr. Zurzolo's inappropriate touching of an African-American female secretary is facially unrelated to race.  While such conduct may be evidence of discrimination on the basis of sex, courts have held that evidence of sex discrimination in cases involving race discrimination, and vice versa, is irrelevant given the lack of correlation between the two kinds of discrimination. See, e.g., Kelly v. Boeing Petroleum Servs., 61 F.3d 350, 357-60 (5th Cir. 1995) (holding that comments pertaining to race, sex and national origin have no tendency to prove disability discrimination and, therefore, were properly excluded by trial court on relevance and prejudice grounds); Mingo v. Roadway Express, Inc., 135 F. Supp. 2d 884, 892 (N.D. Ill. 2001) (excluding evidence of racially offensive statement in sexual harassment case because "the statement has little probative value, but it is highly prejudicial"); Rauh v. Coyne, 744 F. Supp. 1181, 1183 (D.D.C. 1990) (granting defendant's motion in limine to exclude evidence of race discrimination in matter involving claim of gender discrimination because "in view of the weak correlation between the two types of discrimination, the proposed evidence against black employees would likely be of little probative value but it would have very great potential for prejudice").

Fifth, nothing in the record beyond Mr. Brooks's speculation suggests that Mr. Brooks's promotional banner was stolen because of Mr. Brooks's race.  The circumstantial fact that Mr. Brooks was the only African-American account executive alone is insufficient to turn an incident of "workplace discord" or competitive insecurities into evidence of intentional discrimination. See Johnson v. Souderton Area Sch. Dist., No. 95-7171, 1997 WL 164264, at *5 (E.D. Pa. Apr. 1, 1997) (dismissing hostile work environment claim where plaintiff failed to "show that if she were a white person, she would not have been treated in the same manner") (citing Andrews, 895 F.2d at 1485).

Lastly, the uncontested testimony fails to demonstrate any link between the distribution of the Book and racial animus.  Mr. Zurzolo's uncontroverted testimony establishes that Mr. Zurzolo purchased and distributed the Book in order to address the casual dress of a female account executive.  (R. 559a-60a.)  Moreover, Mr. Zurzolo did not read the Book before distributing it and, therefore, was unaware of any racially offensive passages.  (R. 572a.)  Mr. Zurzuolo's testimony was corroborated by Juanita Milliner, Mr. Zurzolo's assistant, who is African-American and who testified that, based on the passages from the Book Mr. Brooks read to her, and having worked closely with Mr. Zurzolo for three years, she did not believe Mr. Zurzolo had read the Book.  (R. 626a.)  Thus, there is no evidence in the record that the motivation for the distribution of the Book was related to race.[14]

While the Court must be mindful that facially neutral actions can constitute invidious discrimination, there must be *some evidence* in the record, beyond Mr. Brooks's own speculation and bald assertions, that suggests that those facially neutral actions were motivated by racial animus.  Here, nothing in the record indicates that any of the actions of which Mr. Brooks complains were motivated by an intent to discriminate against Mr. Brooks because of his race.  Thus, the undisputed and uncontested facts fail to establish the first element of a hostile work environment claim.

### b.    Whether the Alleged Harassment Was Severe or Pervasive

Even if the evidence in the record sufficed to raise a genuine issue of fact as to whether Mr. Brooks was subject to intentional discrimination, the alleged discriminatory conduct is not

---

[14] In addition, these facts were adopted by the PHRC in its Findings of Fact, which Mr. Brooks urges the Court to accept as "binding admissions before this Court."  See Pl. Mem. 3 n.1; PHRC Findings of Fact, Def. Ex. A, at ¶¶ 91, 93.

sufficiently pervasive or severe to constitute a hostile work environment.

In <u>Harris v. SmithKline Beecham</u>, 27 F. Supp. 2d 569 (E.D. Pa. 1998), the court dismissed the plaintiff's hostile work environment claim on the grounds that the plaintiff "produced no evidence that the actions of [the defendant] were physically threatening or interfered with her ability to do her job." <u>Id.</u> at 578.   The court further noted that the alleged racial comment made to the plaintiff by her supervisor, who asked the plaintiff if she was happy that there were more black people in the department" – was "isolated and not severe." <u>Id.</u>  The other acts of which the plaintiff complained, such as lack of opportunities, undesirable assignments and lack of institutional support in the form of training or updated software, "were sporadic and infrequent such that they cannot be said to characterize the environment in which [the plaintiff] worked."  <u>Id.</u>

Similarly, in <u>Morgon v. Valenti Mid-Atlantic Management</u>, No. 01-134, 2001 WL 1735260 (E.D. Pa. Dec. 14, 2001), the court dismissed the plaintiff's hostile work environment where the plaintiff alleged that she was called a "n-----," that her supervisor made a comment about not hiring Jamaicans, that she was called "illiterate," and that she was assaulted by her supervisor.  The court held that the discrimination alleged by the plaintiff was not pervasive, and the "illiterate" comment and the assault were "not tied into plaintiff's color or race."  <u>Id.</u> at *3. <u>See also</u> <u>Rose v. Woolworth Corp.</u>, 137 F. Supp. 2d 604, 608, 611 (E.D. Pa. 2001) (granting summary judgment to defendant on hostile work environment claim where plaintiff alleged that supervisor subjected plaintiff to "constant and unremitting negative comments and evaluations" based at least in part on plaintiff's race, referred to black community as a "baby factory," stated that blacks are incapable of thinking analytically, and warned the plaintiff, who was black, not to

talk to white women); <u>Francis v. Chemical Banking Corp.</u>, 62 F. Supp. 2d 948, 959-60 (E.D.N.Y. 1999) (granting summary judgment in favor of employer on plaintiff's hostile work environment claim where plaintiff alleged that a supervisor had called a group of African-American employees "f-----g moolies," another supervisor referred to a co-worker as "n-----," a third supervisor questioned the use of giving money to the United Negro College Fund, and plaintiff found written on his workstation, "All 'n-----s' should go back to Africa with a Jew under each arm").

The alleged incidents in the present case do not rise to the level of the allegations dismissed in the foregoing cases, particularly because only two of the alleged actions were directed toward Mr. Brooks – the comment about his fiancée and the theft of his promotional banner.  Neither of these incidents, standing alone, appear to be physically threatening or so humiliating that they would unreasonably interfere with Mr. Brooks's ability to perform his job. <u>See Harris</u>, 510 U.S. at 22 (holding that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . . These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").

Moreover, there is "no similarity or common theme connecting the events."  <u>See Johnson</u>, 1997 WL 164264, at *6 (finding no evidence that the alleged instances of discrimination were pervasive or regular where "[a] number of different persons [were] involved and there [was] no evidence of concerted action").  Here, with the exception of the incident involving the promotional banner, Mr. Brooks has alleged only a single perpetrator, Mr. Zurzolo.  Only one of

Mr. Zurzolo's alleged acts was directed toward Mr. Brooks, and at least two (the "dago" comment and the distribution of the Book) were not specifically directed toward any African-American employee or employees.

Thus, even assuming the truth of Mr. Brooks's allegations, the evidence in the record is insufficient to establish the second element of a hostile work environment claim.

### c.    Effect on a Reasonable Person of the Same Protected Class

The parties did not focus on this issue and the Court will not either, as it appears to be a moot issue, given that the Court's findings on this element will be largely dependent on its finding with respect to the first two elements.  In other words, where the Court determines that the conduct in question was not intentional discrimination on the basis of race and was not severe or pervasive, it would be inconsistent to find that a reasonable member of the plaintiff's protected class in the plaintiff's position would find the alleged conduct equally intolerable.  See Johnson, 1997 Wl 164264, at *6 (holding that "the fact [that plaintiff] found the conditions intolerable, alone, will not suffice because Title VII does not guarantee a work environment free of stress," and that, other than one incident which was promptly remedied, "[t]here is no objective evidence that the other events were based on racial discrimination . . . or that a reasonable person would be affected by them").

### 2.    Constructive Discharge Claim

To prevail on a constructive discharge claim, a plaintiff must prove that his employer *knowingly permitted* his working conditions to become so intolerable that a *reasonable person* in his position would have felt compelled to resign.  Aman, 85 F.3d at 1084 (quoting Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)) (emphasis added).  This standard is an objective test

of whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign."  Goss, 747 F.2d at 887-88.  Because most employees believe their jobs are stressful in some regard, more than complainant's subjective perceptions of unfairness, harshness, or a stress-filled work environment is required to establish a constructive discharge.  Aman, 85 F.3d at 1083.  As the Court of Appeals has explained,

> the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by h[er] co-workers. [Sh]e is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).  See also Stewart v. Weis Mkts., Inc., 890 F. Supp. 382, 392 (M.D. Pa. 1995) (To prove constructive discharge, a plaintiff "must demonstrate that [his employer] subjected him to harassment that was more severe or pervasive than the minimum required to prove a hostile work environment.") (citation omitted).

Because Mr. Brooks has failed to make out a hostile work environment claim, and has not alleged any other unlawful employment practice, there is no foundation for his constructive discharge claim.  The evidence in the record is insufficient to raise a genuine issue of fact as to whether Mr. Brooks was subject to intentional discrimination on the basis of race, and as to whether any such discrimination was severe or pervasive.  Thus, the record does not support a

hostile work environment claim.  It follows that the evidence in the record is likewise insufficient to establish a constructive discharge claim, which requires a showing that working conditions were so intolerable that a reasonable person would feel compelled to resign.

      **3.**    **Affirmative Defense**

      "An employer is subject to vicarious liability . . . for an actionable hostile environment created by a supervisor . . . ."  Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998).  However, where the alleged harasser is a supervisor and no tangible employment action was taken against the employee, the employer may raise an affirmative defense to liability by showing that (1) the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 807 (emphasis added).  The Court need not address the issue of whether this affirmative defense applies or succeeds under the facts presented here because the evidence in the record is insufficient to support Mr. Brooks's claims.

**CONCLUSION**

      Because the jurisprudence regarding the issue of exhaustion reflects a liberal standard for exhaustion of allegations relating to hostile work environment claims, the Court concludes that Mr. Brooks need not separately exhaust administrative remedies with respect to the additional allegations contained in his judicial Complaint.  Consequently, the decision of the Pennsylvania Commonwealth Court does not bar Mr. Brooks's hostile work environment claim because the relevant facts are different and, therefore, there is no identity of the issue.

However, although Mr. Brooks's claims survive issue preclusion, neither his hostile work environment claim nor his constructive discharge claim can succeed on the merits.  The evidence in the record fails to raise a genuine of fact as to whether Mr. Brooks was subjected to a hostile work environment claim or constructively discharged.  Thus, the Court will grant summary judgment in favor of CBS Radio.

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHAWN BROOKS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CBS RADIO, INC.,** | : | |
| **Defendant** | : | **NO. 07-0519** |

**<u>ORDER</u>**

AND NOW, this 17th day of December, 2007, upon consideration of the defense Motion

to Dismiss, Or in the Alternative, Motion for Summary Judgment (Docket No. 8), the Plaintiff's

response thereto (Docket Nos. 12 and 13) and the Defendant's reply (Docket No. 14), it is hereby

ORDERED that the Motion is GRANTED.

The Clerk of the Court is instructed to enter judgment in favor of Defendant CBS Radio,

Inc. and to CLOSE this case for all purposes.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge